## Case No. 12,628.

### In re SEELEY.

[19 N. B. R. 1.] [1]

District Court, E. D. Michigan. 1879.

BANKRUPTCY — ILLEGAL PREFERENCE — PRESUMPTION—INTENT—GENERAL ASSIGNMENT—DISCHARGE.

1. The rule that every person is presumed to intend the natural and probable consequences of his acts is only a rule of evidence; and, where the testimony is conflicting, it is for the jury to find the actual intent existing in the mind of the party.

2. Though the necessary consequence of a payment by an insolvent debtor may be to give a preference, he will not be conclusively presumed to have intended such preference where the evidence shows he was actuated by a different motive.

3. But where the party is insolvent, and the payment necessarily operates as a preference, and no explanation is offered, the presumption is conclusive, and there is no question for the jury.

4. The words "fraudulent preference," as used in the bankrupt law [of 1867 (14 Stat. 517)], do not import moral fraud. Nothing more is meant than that a payment shall have been made under circumstances which the law inhibits as a preference.

5. The acts enumerated in Rev. St. § 5110, are not in the nature of offences or forfeitures of a right to a discharge, but are rather in the nature of violations of conditions precedent.

6. Quære: Whether it is competent to show that a general assignment for the benefit of creditors was not executed for the purpose of defeating the operation of the bankrupt law?

[Cited in Re Kraft, 4 Fed. 525.]

On motion for a new trial.

James M. Seeley petitioned for a discharge, and the case was tried before a jury upon the following specifications in opposition thereto: (1) A general assignment for the benefit of his creditors to Francis G. Russell, alleged to have been made in contemplation of bankruptcy, and for the purpose of preventing the property so assigned from coming into the hands of the assignee in bankruptcy, and being distributed in satisfaction of his debts. This assignment was executed on Monday, the 11th day of December, 1877, at the Russell House in this city, whither Seeley had gone, partly at least, to avoid the importunity of one of his creditors. It seems that Seeley had contracted to sell his stock to one Auringer for five thousand dollars, for the purpose of paying his debts, but the bargain had fallen through, and by the advice of counsel he finally concluded to execute the assignment. (2) In making a fraudulent preference to one Scott, two days before his general assignment, and when insolvent. The facts were, that Seeley was indebted to Scott in about the sum of twelve hundred dollars, for money loaned; that on the Saturday before the assignment was executed, he permitted Scott to take goods from his store to the amount of eight hundred dollars. This and the transfer to Harris, here-

[1] [Reprinted by permission.]

after mentioned, were the only important transactions for several days before the assignment. Scott had formerly occupied a produce store upon Woodward Ave., near Mr. Seeley's place of business, and had become intimate with him there. For the past twelve or fourteen years, however, he had been a farmer, and it seems had been accustomed to loan Seeley money from time to time, for which a note had been taken, payable on demand. Both Scott and Seeley swear that Scott did not surrender his note, and that there was no agreement that the goods were to be received in payment. On the other hand, there was no mention of the amount of goods Scott was to take, and no particular credit agreed upon. Scott swears that he had intended to open a store himself for the sale of essential oils, had rented a building for that purpose, and had engaged one or two of Mr. Seeley's clerks; but, owing to some failure to raise the money, this plan was never carried out, and the goods were stored in another building, and subsequently bought back by the assignee in bankruptcy at seventy-five cents on the dollar. (3) In making a fraudulent preference to one Harris also, upon the Saturday before the assignment, and when insolvent. There was no conflict here as to the facts. Seeley was indebted to Harris in about the sum of one hundred and twelve dollars, and upon the same day of the transfer to Scott he turned out to him goods to the amount of his debt, in consideration of his surrendering a note for one hundred dollars. On Seeley's journal there is an entry, under date of December 9, 1876, of "bills payable to A. R. Harris, for he surrenders note July 7, 1876, interest at ten per cent., one hundred dollars, half interest on the above note six months, five dollars." This was the entire testimony as to the transaction.

The case was submitted to the jury under instructions that if they found the assignment was made in contemplation of becoming bankrupt, for the purpose of preventing the property from coming into the hands of the assignee or of being distributed in satisfaction of his debts, or if payments were made to Scott or Harris when insolvent, with an intent to prefer them, they should return a verdict of guilty. Exceptions were taken to the refusal of the court to instruct the jury that as matter of law they should return such verdict.

E. E. Kane, for the motion.
Don M. Dickinson, for bankrupt.

BROWN, District Judge. With some hesitation, I submitted the question to the jury whether the assignment and payments in this case were made with the prohibited intent. I am free to say their verdict did not command my approval.

Counsel for the creditors claims that every person is conclusively presumed to intend the natural and probable consequences of his own act, and as it was the necessary effect of the assignment to withdraw the property from the hands of the assignee in bankruptcy, and of the payments to Scott and Harris to prefer them over the other creditors, the court was bound to find the intent as matter of law, and to take the case away from the jury. The position of the bankrupt was that this rule that a man is held to contemplate the necessary consequences of his acts is a mere rule of evidence, and that it is for the jury to find the actual intent existing in the mind of the party. My own view is that, as a general rule, the presumption is one of fact, and that where there are circumstances in the case tending to show that the party did not, in paying a certain creditor, in fact intend to prefer him, the question as to the actual intent may be left to the jury, notwithstanding the party was insolvent, and the necessary effect of his payment was to prefer. There have been several cases arisen under the bankrupt law where all the elements of a preference existed, viz. insolvency and payment to a creditor which operated as a preference; in other words, the necessary consequence of the act was to prefer, and yet the court has not hesitated to find that no preference was intended. Such are the cases where payment has been made under a bona fide misapprehension of the debtor's real condition, though he was in fact insolvent, and where payment was made to grocers, butchers, and other persons furnishing necessaries to a debtor's family, or by a tenant to a landlord, in order to preserve his home, or prevent the forfeiture of a lease. In such cases the debtor is only presumed to know his condition until the contrary appears, the burden of proof being upon him. In re Silverman [Case No. 12,855]; In re Oregon Bulletin Printing & Publishing Co. [Id. 10,559]; Miller v. Keys [Id. 9,578]; In re Batchelder [Id. 1,098].

In Re Locke [Case No. 8,439] the court observes: "I am not prepared to say that the mere payment of a debt by a debtor who is insolvent, and knows it, is always and necessarily an act of bankruptcy. Upon this point I give no opinion. Such a rule is open to the same objection with the one just considered, viz. that it substitutes an inflexible rule of law for an inference which is properly one of fact; that every person must be presumed to contemplate the necessary consequences of his act is true, but when we come to consequences that are only more or less probable, it is fit that the jury should say whether they were in the mind of the party or not. No doubt, in the absence of controlling evidence, they may decide by the act itself; but the intent to prefer must include, I think, the intent or at least the fear of stopping payment, which idea is not necessarily included in insolvency." In re Croft [Case No. 3,404]. In the case of In re Rosen-

field [Id. 12,057], Judge Field, of New Jersey, held that servants' wages, payments made to counsel for services rendered and to be rendered, payments to an insurance company for premiums upon the bankrupt's house and furniture, to save the forfeiture of a lease, and all expenditures made by him in the ordinary course of business for the support of his family, could not be considered fraudulent preferences, notwithstanding all the legal elements of a preference were present, except the intent actually existing in the mind of the bankrupt. So, in Re Sidle [Id. 12,844], the payment of attorney's fees by an insolvent was held no preference under the statute, on the ground of public policy, which makes faith in the matter of attorney fees obligatory upon the parties. In Re Brent [Id. 1,832], Judge Dillon held that payments in the ordinary course of business, with a bona fide expectation that the debtor can keep along without going into bankruptcy, there being no actual design to favor or prefer, will not bar a discharge. In Re Randall [Id. 11,551], Judge Deady remarks that one of the necessary consequences of a general assignment for the benefit of creditors is to prevent the property from coming to the assignee in bankruptcy and being distributed under the bankrupt act, and that the assignors must be presumed to have intended this, unless they show to the contrary. As to this, the burden of proof is upon them. See, also, Webb v. Sachs [Id. 17,325]; In re Pierce [Id. 11,141].

I have no doubt the law is correctly stated in a recent case of Rice v. Grafton Mills, 117 Mass. 228. The evidence tended to show that one Smith, of whom the plaintiffs were assignees, was the keeper of a grocery and variety store, which was largely patronized by the employés of the defendant; that Smith was accustomed to deliver goods to these employés, rendering accounts monthly to the defendant, which paid to Smith whatever balance was due from the mills to their laborers. Smith was also indebted to the defendant in the sum of one thousand nine hundred dollars for money loaned. The amount of goods delivered in the two months preceding Smith's bankruptcy was about one thousand five hundred and eighty dollars, and the defendant, instead of paying the money to Smith, knowing his approaching bankruptcy, applied this amount to the balance due from Smith for money loaned; thus reducing it to about four hundred and thirty-seven dollars. The assignee claimed this to be a preference, and insisted the money should have been paid to Smith as had been done before, instead of applying it upon his account for money loaned. The court observes: "The intent to prefer is essential, and is to be found by the jury. A preference was not the direct or necessary consequence of the acts of Smith. A man may, indeed, be presumed to intend the nat-

ural and probable consequences of his own acts, but that presumption is only one element of proof to establish the fact of actual intent. The evidence does not show that, prior to the attachment by which Smith's business was interrupted, the probability that the defendant would insist upon a set-off, and thus secure a preference, was so obvious as conclusively to maintain the proposition that he contemplated it, and sold and delivered the goods with the view to such a preference, especially against the fact assumed by the instructions that he expected and supposed otherwise." What the court would have held if the preference had been the direct and necessary consequence of the acts of Smith, and no doubt had been cast upon his intention by the circumstances connected with the payment, does not appear.

We may consider the law then settled that, although the act must necessarily produce a certain result, the party is not conclusively presumed to have intended such result, where other circumstances tend to show that he may have contemplated a different one. But, where the act is wholly unexplained, and the effect is not only natural and probable but necessary, and no attempt is made to show that the party contemplated a different result, I understand the presumption to be conclusive, and the court is bound to instruct the jury as a matter of law. So, where the evidence is so overwhelming that the court, in an ordinary case, would be justified in taking the question away from the jury, I do not understand that the fact that such evidence bears upon the intent of a party in doing a certain act relieves the case from the operation of the general rule in the conduct of trials laid down by the supreme court in Pleasants v. Fant, 22 Wall. [89 U. S.] 116; Commissioners v. Clark, 94 U. S. 278, 284; Seitz v. U. S., 11 Chi. Leg. News, 97. In other words, I do not suppose there is any such sanctity about the question of fraud as requires it to be submitted to a jury when the testimony all points in one direction. "Before the evidence is left to the jury, there is, or may be, in every case, a preliminary question for the judge, not whether there is literally no evidence, but whether there is any on which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed." Commissioners v. Clark, 94 U. S. 284. There seems to be a general impression, even among lawyers, that all fraud in the eye of the law necessarily involves some sort of moral turpitude. This is certainly not the case. The law frequently adjudges that to be fraud which produces a certain result, notwithstanding the entire innocence of the party, not only of a covinous design, but of an intention to bring about that result. Bump, Fraud. Conv. 71; Potter v. McDowell, 31 Mo. 62; Grover v. Wakeman, 11 Wend. 187. And when the words "fraudulent preference" are used in section 5110, Rev. St., nothing more is meant than that a payment shall have been

made under circumstances which the law inhibits as a preference. In re Rosenfield [Case No. 12,058]. There is no element of moral fraud involved in such case, for at common law a man may lawfully pay any creditor in preference to another.

Again, counsel for the bankrupt argued that the jury ought to pass upon the question of intent in every case, as the acts mentioned in section 5110 are in the nature of offences or forfeitures of a right the bankrupt has to his discharge, and the proceeding is therefore quasi criminal. Support for this position is found in an incidental remark of Judge Field in the case of In re Rosenfield [supra]. It is clear, however, that a man has no moral or legal right to be released of his debts, except by virtue of some statute, and that, in the enactment of such statute, congress has the power to impose such conditions as it pleases to the granting of a · discharge. It has, indeed, refused it altogether in voluntary cases, except by consent of a certain proportion of creditors. I am better pleased with those opinions which treat the discharge as a favor, and the commission of one of the acts specified, as the violation of a condition precedent. Such was the position of Judge Hall in Re Cretiew [Case No. 3,390], and of Judge Lowell in Re Goodfellow [Id. 5,536]. I see no reason why, in administering the law regarding fraudulent conveyances under this section, we should apply any other or different rule than if the question arose under section 5021.

Returning now to the main proposition that where the necessary effect of an act is to produce a certain result, and no other intent is shown to have influenced the actor, he · shall be presumed to have contemplated this result, we find it supported by a great weight of authority. In the leading case of Cunningham v. Freeborn, 11 Wend. 240, Mr. Justice Nelson held that even under a statute which provided that the question of fraudulent intent in all cases of assignment should ·be deemed a question of fact, and not of law, fraud in law was not abolished, and that, if the jury found contrary to the law or facts, the court would be bound to set aside the verdict. The court states: "The true doctrine on this subject, notwithstanding the statute, I apprehend, is that if there is any provision in the deed of assignment, or any fact admitted in the answer, which is per se fraudulent according to the law of the case, it is so, the denial of the fraudulent intent to the contrary notwithstanding; that fraud in fact is a question compounded of law and of fact, which is to be found by the jury in a court of law, under proper direction duly observed by them, and may be by the chancellor in a court of equity. * * * The admission of facts which are per se fraudulent in judgment of law are as much so and as conclusive upon the defendant as if he had in express terms admitted a fraudulent intent in his answer, and in such a case any subsequent disclaimer of such intent will not avail him, * * * for the legal intent from

these facts is stronger than the mere admission of it subsequently denied. * * * And if the weight of evidence is such, when applied to well-settled principles of law in relation to these voluntary assignments by failing debtors, as to force upon him the conclusion of a fraudulent intent, he is bound so to find, notwithstanding the denial of it in the answer; and if the jury do not thus find, a court of law would be bound to set aside the verdict." In an early case in this state (Kirby v. Ingersoll, Har. [Mich.] 172), it was held that an assignment containing illegal provisions was void upon its face, notwithstanding all intent to commit fraud was denied. This has ever since remained the settled law of this state. Buck v. Sherman, 2 Doug. [Mich.] 176; Pierson v. Manning, 2 Mich. 445. The state reports contain a large number of cases to the same general effect. Ewing v. Gray, 12 Ind. 64; 9 Ind. 461; Allen v. Wheeler, 4 Gray, 123; Potter v. McDowell, 31 Mo. 62; Milne v. Henry, 40 Pa. St. 352; Freeman v. Pope, L. R. 9 Eq. 206. The supreme court of the United States lent its sanction to the same doctrine in Lukins v. Aird, 6 Wall. [73 U. S.] 78. In this case a debtor in failing circumstances conveyed his land for a valuable consideration by deed, without reservation, but reserved to himself verbally the right to occupy and possess it for a limited time for his own benefit. The court, in this case, found the fraud to be an inference of law, on which the court was as much bound to pronounce the conveyance void as to creditors as if the fraudulent intent were directly proved. To the same effect is Toof v. Martin, 13 Wall. [80 U. S.] 40, 48, in which the intent to prefer was held to be conclusively presumed from the fact of preference.

Under the bankrupt law, decisions to the same effect are numerous. In Re Smith [Case No. 12,974], Judge Hall, in speaking of general assignments for the benefit of creditors, and the presumptions attaching thereto, uses the following language: "Every person of ·a sound mind is presumed to intend the necessary, natural or legal consequences of his deliberate act. This legal presumption may be either conclusive or disputable, depending upon the nature of the act and the character of the intention; and when, by law, the consequences must necessarily follow the act done, the presumption is ordinarily conclusive, and cannot be rebutted by any evidence of a want of such intention." In Re Drummond [Id. 4,093], Judge McDonald held that where the necessary consequences of a transfer by the bankrupt of all his property to a portion of his creditors were not only that it would probably give them a preference, but would necessarily and certainly produce that effect, the bankrupt must be conclusively presumed to have intended it. In Re Black [Id. 1,457], Judge Blatchford held that the burden of proof was upon the debtor to show that he had not the intent to prefer. See, also, In re Sutherland [Id. 13,638]; In re

Batchelder [Id. 1,098]; In re Locke [Id. 8,-439]. In Re Brodhead [Id. 1,918], Judge Benedict held that a general assignment for the benefit of creditors cast upon the bankrupt the burden of showing the absence of the prohibited intent. In Re Goldschmidt [Id. 5,-520], Judge Blatchford treats a general assignment for the benefit of creditors as necessarily involving the existence of a purpose to prevent the property from being distributed in pursuance of the bankrupt act, in satisfaction of the debts, and refused a discharge. In the case of In re Croft [Id. 3,404], Judge Blodgett held that, although a general assignment was an act of bankruptcy, in order to prevent a discharge it must be made with an intent to prefer, or for the purpose of preventing the property from coming into the hands of the assignee in bankruptcy, or from being distributed in satisfaction of his debts. He does not undertake to say that such an assignment does not necessarily presuppose that intent, but finds that in the case before him there were circumstances showing an actual intent in the mind of the bankrupt to withdraw certain property from the partnership fund, and therefore refused a discharge. In the case of In re Bininger [Id. 1,420], Judge Woodruff held that the procuring of a bankrupt's property to be put into the hands of a receiver of a state court necessarily operated to defeat the operation of the bankrupt law, and that in the judgment of the law the bankrupt knew when he did it that it would have that effect, and knowing the effect he must have intended to produce it when he voluntarily chose to do the act. "Whatever his motive was he acted voluntarily in choosing, and therefore in intending all the legal results which would flow from his action in the matter. This was a creditor's petition under section 39. In the case of Globe Ins. Co. v. Cleveland Ins. Co. [Id. 5.486], Judge Emmons held a general assignment to be an act of bankruptcy, upon the ground that it defeated the operation of the bankrupt law. Its effect in barring a discharge was not considered, nor does the learned judge discuss the question whether evidence may be received to show that the bankrupt in fact executed the assignment with no intent to defeat the operation of the act. In the recent case of In re Kasson [Id. 7,617], Judge Wallace held that a voluntary general assignment bears conclusive evidence upon its face of the intent of the assignor to prevent the property transferred being distributed under the bankrupt act. "By such an instrument the debtor not only selects his own assignee, but he selects one who has no power to question or attack a class of transactions which the bankrupt act seeks to prevent."

Let us apply these principles to the facts of this case. The necessary effect of the general assignment to Russell was to withdraw the property assigned from the operation of the bankrupt act, and to secure a distribution by an assignee of the bankrupt's own

choosing. It is true that the assignment expressed an intention upon its face to secure an equal distribution of the assets of the party among his creditors, "and in no manner or way to impede or delay the operation of the bankrupt act, but to give the same benefits which might be derived under the said act, without the costs, expenses, and losses attendant upon the winding up of an estate in bankruptcy." There was also other evidence offered tending to show that the bankrupt did not in fact propose to have his estate wound up by his assignee, but that he executed the assignment as a preliminary step to his filing a voluntary petition, and in order to secure his property from attachment while such petition and the schedules were being prepared. Whether such evidence be competent to rebut the intention which the law infers from such an assignment is a doubtful question. Clearly, if such intention existed the bankrupt would be powerless to carry it out without the assent of the assignee, because when once vested with the trust he becomes the absolute owner for the purposes specified in the assignment, and the assignor cannot revoke it. Several of the cases above cited, however, seem to indicate that such testimony is competent, and that the assignee might show an actual intent different from the one which the law infers from the assignment itself. I do not find it necessary to express an opinion upon the point.

With regard to the transfer of goods to Scott, I think the verdict of the jury was clearly against the weight of evidence, and for that reason, if for no other, it must be set aside. Almost every fact connected with this transaction tends to show that the goods were turned over in payment of Seeley's note, and that Scott had no idea of paying for them. A general denial by Seeley of an intent to prefer will avail nothing as against the undisputed facts connected with the transfer.

There was no dispute at all with reference to the transfer to Harris. The necessary effect of the transfer was to prefer him, and as there was no attempt to explain away the inference that he intended to prefer, the presumption of such an intent must be held conclusive as matter of law.

I think the objecting creditors were entitled to the instruction prayed for, and that the case ought not to have been left to the jury. The verdict must be set aside, and a new trial granted.